William Francis Horsting v. Commissioner.
Horsting v. Commissioner
Docket No. 3094.
United States Tax Court
1946 Tax Ct. Memo LEXIS 182; 5 T.C.M. (CCH) 421; T.C.M. (RIA) 46123; May 27, 1946
*182 Issue (2). [1] Petitioner filed income tax returns for 1940 and 1941. He alone signed the returns. The respondent determined deficiencies for both years and sent the notice thereof to petitioner alone. In this notice the respondent, among other adjustemnts, reduced the personal exemptions claimed by petitioner to that of a single person. He made no determination that the return was a joint return of husband and wife. The petitioner raises no question that the returns filed were not separate returns and alleges that petitioner erroneously reported and the respondent erroneously included in his taxable income income which under the community property laws of Texas belonged to his wife. Held, there is no issue raised by the pleadings as to whether the returns filed were other than the separate returns of petitioner and if the respondent desired to contend that the returns were joint returns he should have raised the issue by affirmative allegations in his answer. This he did not do. Held, further, even if it be assumed that the issue is properly raised, the facts show the returns were the separate returns of petitioner and not joint returns of petitioner and his wife. Held, further, petitioner *183 is entitled to exclude from the taxable income determined by the respondent any income which petitioner has shown belonged to his wife under the community property laws of Texas. Issue (3). During 1940 and 1941, petitioner acted as agent for his wife in connection with her Texas oil properties. He traveled extensively during these years in purchasing and selling oil properties or undivided interests therein. He made 34 separate sales in 1940 and 15 in 1941. Held, petitioner and his wife were in business of buying and selling oil properties. Held, further, the properties held by petitioner and his wife were held primarily for sale to customers in the ordinary course of business and were not capital assets. Issues (4), (5) and (6). During the taxable years petitioner and his wife received proceeds from the sales of a part of their total holdings and also paid expenses and commissions attributable to such sales. Held, petitioner is not entitled to substitute for proof an assumption that because the total holdings represented both the separate property of the wife and community property in certain *184 proven proportions, the proceeds likewise represent both the separate property of the wife and community property in the same proportions. Held, further, that where petitioner has failed to clearly and indisputably trace and identify any of the proceeds as representing proceeds from the sale of his wife's separate property, the entire proceeds are, under Texas law, community property. Held, further, all expenses and commissions attributable to such sales should, in view of the previous holding, be allowed as community deductions. Issue (8). Upon the evidence, held, petitioner has failed to prove that he and his wife paid any delay rentals in 1941. Issue (9). In 1939, petitioner and his wife sold approximately 25 percent of their undivided interests in the Haldeman Subdivision to three syndicates and agreed that the syndicates would immediately become vested with the ownership of the same proportion of any undivided interest in this subdivision which petitioner and his wife might thereafter acquire. Petitioner and his wife were not obligated to acquire any additional interests. They did, however, acquire additional interests in 1940 and 1941. Held, that part of the costs attributable *185 to the interests thus acquired in 1940 and 1941 which immediately became the property of the syndicates is not deductible by petitioner and his wife in 1940 and 1941 as either expenses, losses or costs, but should be capitalized and added to the costs of the interests purchased in 1940 and 1941 which petitioner and his wife were entitled to retain. Issue (10). Upon the evidence, held, petitioner and his wife are entitled to a deduction of a certain amount for each year as representing a reasonable allowance for compensation for personal services actually rendered by their son during those years. Issue (13). Upon the evidence, held, petitioner has failed to prove in what year a certain debt became worthless. Issue (14). During the taxable year 1941, petitioner and his wife sold approximately 10 percent of their undivided interests in the Haldeman Subdivision to two additional syndicates for a cash consideration and a return of 58 royalty acres previously sold by them. In view of our holding under Issue (3), held, the exception provided for in subsection (b) of section 112, I.R.C., to the general rule stated in subsection (a) of section 112 does not apply and the entire amount of *186 the gain realized on these sales should be recognized. Issue (15). Upon the evidence, held, petitioner is entitled to a separate loss deduction in 1941 of the cost of certain leases which were his separate property and which, after the drilling of two dry holes on opposite sides of the property in 1941, petitioner abandoned by failure to pay the delay rental which became due in that year. Issue (16). During 1941, petitioner and his wife sold certain undivided royalty interests to two individuals for a cash consideration. In connection with these sales petitioner and his wife transferred to these individuals as bonuses certain shares of syndicate units which had a cost basis to petitioner and his wife of $750. Held, this cost basis should be considered in determining the gain or loss from the sales of the undivided royalty interests. Issue (18). Upon the evidence, held, petitioner has not shown that the failure to file the 1940 return within the time prescribed by law was due to reasonable cause and not to willful neglect. Held, further, the penalty provided in section 291, I.R.C., for failure to file on time should be added. Scott P. Crampton, Esq., for the petitioner. David F. *187 Long, Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion The respondent determined deficiencies in petitioner's income tax for the calendar years 1940 and 1941 in the amounts of $4,734.27 and $7,587.30, respectively, and also a penalty of $1,183.57 for failure to file the 1940 return within the time prescribed by law. The deficiencies are the result of several adjustments to the net income as disclosed by petitioner's returns, a reduction of the personal exemption claimed thereon, the disallowance of the credit for dependents claimed for both years and a reduction of the earned income credit claimed on the 1941 return. By appropriate assignments of error petitioner contests most of these adjustments, reductions and disallowances and also places in issue several other items affecting petitioner's tax liability for both years. As a result petitioner contends that instead of the said deficiencies and penalty he is entitled to a "refund of the taxes paid for the years involved." Specifically the issues thus generally outlined are as follows: (1) Did the respondent erroneously fail to allow petitioner the personal exemption due a married man living with his wife and *188 the credit due him for a dependent in each of the years involved? (2) Did the respondent erroneously overstate petitioner's taxable income for both years by including therein the sums realized by petitioner's wife from the sale of her separate property and the sums realized by her from the sale of community property in each of the years involved? (3) Did the respondent erroneously overstate petitioner's taxable income for both years by failing to tax as long-term capital gain the gain derived in those years from the sale of the wife's separate property? (4) Did the respondent erroneously overstate petitioner's taxable income for both years by failing to allow to petitioner a return of his costs on the sale of his interests in oil properties? (5) Did the respondent erroneously disallow as deductions for both years the amounts of $6,800 and $7,500, respectively, as commissions paid by petitioner on the sale of his interests in oil properties, and erroneously fail to allow as additional deductions therefor the amounts of not less than $4,375 and $2,425, respectively? (6) Did the respondent erroneously disallow as deductions for both years the amounts of $5,603 and $5,250, respectively, *189 as expenses incurred and paid by petitioner in connection with the sale of his interests in oil properties, and erroneously fail to allow as additional deductions therefor the amounts of not less than $3,551.91 and $4,655.64, respectively? (7) Did the respondent erroneously fail to allow a deduction for depreciation for both years of not less than $500 for each year on an automobile? (8) Did the respondent erroneously fail to allow as deductions for both years amounts of not less than $420 and $2,646, respectively, as delay rentals paid by petitioner in those years? (9) Did the respondent erroneously fail to allow as deductions for both years amounts of not less than $6,979.83 and $3,500.65, respectively, as costs, losses, or expenses representing the interests in property purchased in 1940 and 1941 which went to syndicates formed in 1939? (10) Did the respondent erroneously fail to allow as deductions for both years amounts of not less than $6,110.42 and $3,532.60, respectively, as representing payments made to William Francis Horsting, Jr., as compensation for his services? (11) In the alternative, if it should be held that the interests in oil properties sold by petitioner in 1940 *190 and 1941 were not sales of leases and not sales of mineral in the ground, then did the respondent erroneously fail to allow petitioner an appropriate deduction for depletion for both years? (12) Did the respondent err in allowing petitioner an earned income credit of only $300 for each year? (13) Did the respondent erroneously fail to allow petitioner a bad debt or loss deduction of $500 for the year 1940? (14) If it should be held that certain property interests exchanged by petitioner in 1941 in the formation of the First and Second Southwest Oil Syndicates were not a tax-free exchange, then did the respondent erroneously fail to allow petitioner a deduction in 1941 of not less than $4,317.29 as representing the cost of the property transferred to these syndicates? (15) Did the respondent erroneously fail to allow a loss deduction for 1941 of not less than $5,142.80 sustained by petitioner in that year upon the abandonment of Louisiana oil leases? (16) Did the respondent erroneously fail to allow a loss deduction for 1941 of not less than $850 sustained by petitioner in that year upon the sale of certain syndicate units? (17) Did the respondent erroneously fail to allow a loss deduction *191 for 1941 of not less than $598.75 sustained by petitioner in that year upon the abandonment of two Texas oil leases? (18) Did the respondent erroneously determine that petitioner was liable for a 25 percent penalty for 1940 for failure to file the 1940 return within the time prescribed by law? Issue (1) was disposed of by stipulation, the parties agreeing that in computing petitioner's tax liability for 1940 and 1941, petitioner is entitled to personal exemptions in those years of $2,000 and $1,500, respectively, and to a credit for dependent (his son Robert, who was born February 7, 1923) in those years of $400 and $33.33, respectively. Issue (7) was waived by petitioner at the hearing. Issue (17) was disposed of by stipulation, the parties agreeing that the amount of $598.75 is a deductible loss to petitioner and his wife in 1941. Effect to these stipulations will be given under Rule 50. Findings of Fact Generally. Petitioner is an individual residing at Wilmette, Illinois. The returns for the periods here involved were filed with the Collector for the First District of Illinois. Petitioner's books were kept and the returns were filed on the cash receipts and disbursements basis *192 and by calendar years. For the year 1940, petitioner reported a gross income of $26,600; deductions of $21,347; and a net income of $5,253. He claimed a personal exemption of $2,000; a credit for dependents of $400; and an earned income credit of $300. On this showing he paid an income tax of $112.33 and a penalty of $28.08. He alone signed the return. He explained the gross income in a schedule attached to the return as follows: The entire cash income represents the sale of undivided fractional interests in a block of oil leases and royalty contracts in process of being assembled. This block has been in process of being assembled since March, 1939, and represents several hundred separate pieces, the block values of which are impossible to determine or appraise until completed and proved or disproved. The said deductions totaling $21,347 were explained in separate schedules as follows: Loss account misapplication of funds for
expense and operation advanced by
W. F. Horsting in connection with
Gable Lodges
$ 8,944
Commissions in connection with sale of
interests in oil leases paid to Williams
Burden
6,800
Traveling expense
5,603
Total deductions claimed on return
$21,347
The respondent disallowed *193 all of the said deductions for lack of substantiation; reduced the personal exemption to $800; disallowed the credit for dependents; but did not disturb the earned income credit claimed of $300. For the year 1941, petitioner reported as the gross sales price of 75 royalty acres the amount of $26,250; deductions of $21,660; and a net income of $4,590. He claimed a personal exemption of $1,500; a credit for dependents of $800; and an earned income credit of $459. On this showing he paid an income tax of $280.70. He alone signed the return. The said deductions totaling $21,660 were explained in various schedules as representing the following: Cost or other basis of royalties sold
$ 7,500
Expenses of sale
5,250
Expenses
6,310
Interest
2,000
Taxes
600
Total deductions claimed on return
$21,660
The respondent disallowed all of the said deductions for lack of substantiation; reduced the personal exemption to $750; disallowed the credit for dependents; and reduced the earned income credit to $300. The original petition in this proceeding was filed on October 7, 1943. On February 23, 1944, petitioner filed an amended petition in which he claimed a refund of the taxes paid for the years involved. The second *194 amended petition filed October 1, 1945, makes the same claim for refund. Any part of the "Partial Stipulation of Facts" not specifically set forth herein is incorporated herein by reference. Issues (2) to (6), inclusive. Petitioner and his wife, Louise Haldeman Horsting, were married in 1913. Following their marriage they have always resided in Wilmette except for a few months in St. Louis, Missouri. Petitioner and his wife made no prenuptial contracts regarding their separate property and neither of them had any appreciable amount of property at the time of their marriage. Petitioner and his wife have never made any contracts since their marriage with respect to a division of property between them. In 1905 the father of petitioner's wife purchased about 60,000 acres of land in the State of Texas and subdivided the land into small citrus farms for sale. On November 6, 1933, after the death of her father, petitioner's wife by warranty deed (from her brother) for and in consideration of $1.00 and "other good and valuable consideration" became the owner of an undivided onehalf interest in part of said land consisting of about 592.76 acres, more or less, situated in the County of Jim *195 Wells, State of Texas, and known and described as R. P. Haldeman's Subdivision of the Seeligson Ranch. Petitioner's wife did not give her brother anything for this undivided one-half interest. The transfer from her brother was made as the result of a request made by their father during his lifetime. It was the belief of the Haldeman family that there was a possibility that oil would some time be discovered on this property. Petitioner first became actively interested in his wife's property in 1936 when he received a long distance telephone call from an oil company. In the course of this telephone conversation petitioner was offered first $1.00 an acre for a lease on this property and when he refused he was immediately offered $10 an acre, which he also refused. Petitioner then went to Texas and found that an oil well had been brought in a mile and a half to two miles northeast of his wife's property and that another well was being drilled about two miles southwest of her property. Petitioner and his wife discussed the new situation and after the second well to the southwest of this property came in early in 1937, petitioner and his wife decided to use what money they had in the acquisition *196 of additional oil properties between these producing wells and adjacent to those held by petitioner's wife. At that time petitioner was engaged in the manufacturing of tanning machinery, which had been his business during the preceding 18 years. He had accumulated approximately $22,000 from his earnings since his marriage. Petitioner and his wife borrowed an additional $12,000 on a note of the petitioner secured by a mortgage on an Illinois farm owned by petitioner's wife. Petitioner had a power of attorney from his wife to do whatever he wanted to do with her properties in Texas. In 1939 or 1940 petitioner and his wife acquired a 1/2 interest in a 1/8 royalty in 40 acres (20 royalty acres) of the Haldeman Subdivision. No cost is claimed on this acquisition. In 1940 petitioner and his wife acquired a 1/4th interest in a 1/8th royalty in 890 acres (222.50 royal acres) of the Haldeman Subdivision at a cost of $16,666.25; also a 1/2 interest in a 1/8th royalty in 20 acres (10 royalty acres) of the Haldeman Subdivision at no cost; also a 1/8th royalty interest in 20 acres (20 royalty acres) of the Haldeman Subdivision at a cost of $825; and also a 1/2 interest in a 1/8th royalty in 168 *197 acres (84 royalty acres) of the Haldeman Subdivision at a cost of $4,719.46. The total cost of all these interests (356.50 royalty acres) was $22,210.71, and represented community property of petitioner and his wife. During 1940 petitioner's wife owned as her separate property a 1/2 interest in a 1/8th royalty in 422.76 acres (211.38 royalty acres) of the Haldeman Subdivision. No cost is claimed on this separate property. Thus, during 1940, petitioner and his wife together owned a total of 567.88 royalty acres having a cost basis of $22,210.71, of which ownership 37.22 percent represented the separate property of petitioner's wife with no cost basis. Prior to 1940 petitioner and his wife acquired certain oil and gas leases in Jim Wells County, Texas, at a cost of $7,983.37. In 1940 they acquired additional oil and gas leases in the same county at a total cost of $9,042.86. From 1939 through 1941 petitioner and his wife made various sales to certain syndicates described as Haldeman Subdivision Oil Syndicate, Jim Wells County Oil Syndicate, Jim Wells-Horsting Oil Syndicate, First Southwest Texas Oil Syndicate, and Second Southwest Texas Oil Syndicate, and hereinafter sometimes referred *198 to as the 1st, 2nd, 3rd, 4th and 5th syndicates, respectively. Petitioner and his wife had received a great many offers to purchase their properties outright during this period but they consistently refused to sell. They would only sell undivided interests in the properties. During 1940 petitioner and his wife in 26 separate transactions sold undivided royalty interests out of their total holdings for an aggregate gross sales price of $38,663.89. Petitioner has not shown what part, if any, of these total sales were sale of the separate property of petitioner's wife. The aggregate cost to petitioner and his wife of these royalty interests sold by them in 1940 was $5,144.20. During 1940 petitioner and his wife received an aggregate of $14,000 from eight separate sales to members of the 3rd syndicate. Petitioner has not shown what part, if any, of these total sales were sales of the separate property of petitioner's wife. The interests sold to the 3rd syndicate had an aggregate cost basis of $1,099.57 for the royalty interests and $1,974.59 for the leases. During 1940 petitioner and his wife incurred and paid traveling and miscellaneous expenses of $9,154.91 in connection with the sales *199 of the royalty interests and syndicate interests mentioned above. They also paid commissions to salesmen of $11,175. During the period from January 1, 1941 through June 30, 1941, petitioner and his wife sold undivided royalty interests (62.2847 royalty acres) out of their total holdings in 10 separate transactions at an aggregate gross sales price of $21,300. Petitioner has not shown what part, if any, of these total sales were sales of the separate property of petitioner's wife. The aggregate cost of these royalty interests sold by them in this period was $2,850.08. During the period from July 1, 1941 through December 31, 1941, petitioner and his wife sold in three separate transactions undivided royalty interests (14.713 royalty acres) out of their total holdings for an aggregate gross sales price of $5,150. Petitioner has not shown what part, if any, of these total sales were sales of the separate property of petitioner's wife. The aggregate cost to petitioner and his wife of the royalty interests thus sold by them in this period was $1,426.90. The said three sales made during this period are exclusive of sales hereinafter mentioned under Issue (14) to the 4th and 5th syndicates *200 during July 1941. See also Issue (16). Petitioner and his wife incurred and paid traveling and miscellaneous expenses of $9,915.64 in 1941 in connection with the sales of the royalty interests and syndicate interests sold by them in that year. They also paid commissions to salesmen of $8,925. These expenses and commissions are exclusive of the expenses, commissions and attorney fees mentioned under Issue (14) below. Petitioner and his wife at the time of the hearing of this proceeding had about two and one-half times as much proven acreage as compared with that originally owned by petitioner's wife as her separate property. On this acreage are seven producing oil wells and one producing gas well. Surrounding the property are about 550 wells. Petitioner and his wife had no income during the taxable years involved other than from the sales of undivided interests in their oil properties. Petitioner was continually buying oil properties and selling undivided interests in oil properties for himself and his wife in 1940 and 1941, and was almost continually on the road closing out the transactions. Petitioner traveled in 30 states during 1940 and 1941 in the purchase of oil properties and *201 in about four states in the sale of undivided interests in oil properties during those years. Five persons, not counting his son, were employed by petitioner and his wife at one time or another in 1940 and 1941 in connection with the buying and selling of these properties. Petitioner inserted the words "Dealer-oil leases" in answer to the first question asked on the 1940 return which was "1. State your principal occupation or profession -." Petitioner, during the years 1940 and 1941, was always willing to sell an undivided interest in any of the oil properties owned by himself and his wife whenever he considered the purchase price good. Petitioner and his wife, represented by petitioner as her duly authorized agent, were engaged in the business of buying oil properties and selling undivided interests in oil properties which were held primarily for sale to customers in the ordinary course of their business during the taxable years 1940 and 1941, and the gain from such sales is taxable as ordinary income. The returns filed by petitioner for 1940 and 1941 were his own separate returns. No separate income tax returns were filed by petitioner's wife, Louise Horsting, for the years 1939, *202 1940 and 1941, and no request was made by her for an extension of time to file separate income tax returns for said years. The Commissioner in his determination of the deficiencies did not determine that the returns filed were joint returns of husband and wife and he has raised no such issue by any affirmative allegations in his answer. Issue (8). During 1940 petitioner and his wife paid delay rentals on oil and gas leases held by them on land in Jim Wells County, Texas, of $420. Issue (9). On May, 9, 1939, petitioner addressed a letter to the Haldeman Subdivision Oil Syndicate (1st syndicate), the opening paragraph of which was as follows: In accordance with our discussions, I agree to sell to your Syndicate for the sum of $29,500. one-quarter of all my interest in all leases owned and to be owned by the Horsting-James partnership; also one-eighth of my interest in all royalties under the Horsting land, which interest has not yet been divided with the James Petroleum Corporation; also one-quarter of my interest in other royalties which may be acquired. A description of the 1st syndicate was attached to the letter of March 9, 1939, which description contained a paragraph reading *203 as follows: The James Petroleum Corporation, of Tulsa and New York, made a partnership agreement last year with W. F. Horsting covering his land, and included a campaign to acquire additional leases from the many land owners in the Haldeman subdivision, the cost being borne by the partnership equally. 1200 additional acres have been secured so far by Mr. Horsting, who is the son-in-law of the late R. P. Haldeman, who owned, sub-divided and sold the 68 square mile tract. On June 13, 1939, petitioner addressed a letter to the Jim Wells County Oil Syndicate (2nd syndicate), the opening paragraph of which was as follows: In accordance with our verbal understanding. I agree to sell to your Syndicate for the sum of $18,500, five-thirty-seconds of my interest in all leases owned and to be owned by the Horsting-James partnership; also five-thirty-seconds of my interest in all royalties under the Horsting land; also five-thirty-seconds of my interest in other royalties, and five-thirty-seconds of my interest in other leases, which may be acquired in the Haldeman Subdivision in Jim Wells, Texas, under the aforesaid partnership agreement. Five-thirty-seconds of my half interest is equivalent *204 to five-sixty-fourths of the entire spread. A description of the 2nd syndicate was attached to the letter of June 13, 1939, which description contained a paragraph similar to the above-quoted paragraph from the description of the 1st syndicate. On December 20, 1939, petitioner addressed a letter to the Jim Wells-Horsting Oil Syndicate (3rd syndicate), the opening paragraph of which was as follows: In accordance with our verbal understanding, I agree to sell to your Syndicate for the sum of $15,000, three-thirty-seconds of my interest in all leases owned and to be owned by the Horsting-James partnership; also three thirty-seconds of my interest in all royalties under the Horsting land; also three thirty-seconds of my interest in other royalties and three-thirty-seconds of my interest in other leases, which may be acquired in the Haldeman Subdivision in Jim Wells, Texas, under the aforesaid partnership agreement; three-thirty-seconds of my half interest is equivalent to three-sixty-fourths of the entire spread. A description of the 3rd syndicate was attached to the letter of December 20, 1939, which description contained a paragraph similar to the above-quoted paragraph from the description *205 of the 1st syndicate. Under the above agreements with the 1st, 2nd and 3rd syndicates, petitioner and his wife were to be paid as the syndicates disposed of their shares. The 1st syndicate was to sell 59 shares at $500 per share; the 2nd syndicate was to sell 37 shares at $500 per share; and the 3rd syndicate was to sell 30 shares at $500 per share. Under these agreements petitioner also agreed to devote his time and effort for one year towards making drilling contracts, acquiring additional leases, "and generally improving our investment position, free of cost to you." The 1st, 2nd and 3rd syndicates which were formed in 1939 were entitled to share in properties thereafter acquired by petitioner and his wife in the same proportions as they originally share in properties held by petitioner and his wife. In view of this arrangement an undivided interest in the oil and gas leases acquired by petitioner and his wife in 1940 and an undivided royalty interest acquired by them in 1940 immediately belonged to said syndicates. The cost of these undivided interests in 1940 which thus belonged to the said syndicates was the amount of $5,300. The cost of similar interests in 1941 which thus belonged *206 to the said syndicates was either the amount of $5,180.48 or the amount of $2,255.53 depending upon whether Issue (14) is decided in favor of the petitioner or the respondent. These costs of $5,300 and either $5,180.48 or $2,255.53, are not deductible by petitioner and his wife as expenses, losses or costs, but should be capitalized and added to the total cost of the undivided interests which petitioner and his wife purchased in 1940 and 1941 and which they were entitled to retain. Issue (10). William F. Horsting, Jr., is petitioner's son. During 1940 he was 26 years of age and unmarried. He graduated in liberal arts at Northwestern University about 1934. Prior to 1940 the son had had no experience in the sale of oil leases or royalty interests. During 1940 and 1941 he lived with his parents in Wilmette and helped them in looking after their oil property in Texas. In 1940 he spent his entire time buying leases and in 1941 he spent his entire time selling undivided interests. He was a good salesman. He worked with a Mr. Burden, a Mr. De Frain and a Mr. Cutler. These men were employed by petitioner and his wife at one time or another in selling undivided interests in oil properties *207 and a Mr. Presnall and a Mr. Lion were employed at one time or another in buying oil properties. During 1940 and 1941 petitioner traveled extensively in connection with these purchases and sales. Elsewhere in this report we have allowed deductions for such traveling expenses paid by petitioner and for the commissions paid the said five individuals other than petitioner's son. Petitioner had a written agreement with his son relative to his employment, but at the time of the hearing held herein, petitioner had not been able to locate the agreement. The terms of the agreement were that petitioner and his wife were to pay their son one-third of the profits received from their oil operations in Texas. In accordance with this understanding petitioner and his wife paid their son $6,430 in 1940 and $3,984.39 in 1941. This was the only income received by the son in these years. The said payments were for the son's services in assisting his parents. The son married late in 1941 and later became a commissioned officer in the United States Navy. Petitioner did not claim any deduction for compensation paid to his son in either the 1940 or 1941 return. The first claim made for such deductions was *208 made in the second amended petition. Petitioner and his wife are entitled to a deduction of $1,800 for each year as representing a reasonable allowance for compensation for personal services actually rendered by their son during the taxable years 1940 and 1941. Issue (13). Petitioner in some unknown year loaned a Dr. Dozier, who was an operating physician in Premont, Texas, the sum of $500 and knew at the time of making the loan that it would not be repaid. A lease which petitioner particularly wanted was put up as collateral for the loan. Shortly thereafter and prior to July 1, 1940 the lease was lost through a tax and adverse possession suit. Petitioner tried to collect from Dozier but the latter was unable to pay his rent and lost his office furniture. He moved away from Premont in the spring of 1940. Petitioner talked with Dozier twice afterwards in the Spring of 1940 and was unable to collect anything from him. Petitioner has failed to show in what year this debt became worthless. Issue (14). On July 1 and July 21, 1941, petitioner and his wife sold to the 4th and 5th syndicates, respectively, undivided interests in all the royalty interests and oil and gas leases held by them *209 or thereafter to be acquired by them in Jim Wells County, Texas. The consideration for these two sales was $23,200 and the return of 58 of the royalty acres previously sold by them. The fair market value of the 58 royalty acres received by petitioner and his wife in these two transactions was $20,300. In connection with these two sales petitioner and his wife incurred and paid miscellaneous and traveling expenses, commissions and attorney fees of $4,500. The agreement of sale dated July 1, 1941, described petitioner and his wife as the "sellers" and Marcel A. Palmaro, syndicate manager of the 4th syndicate, as the "purchaser" and among other things provided as follows: FIRST: The sellers will sell, transfer, assign and convey to the purchaser, and the purchaser will purchase an undivided interest equal to seven per centum (7%) of all leases, royalties, distillate rights, mineral rights, and rights of whatsoever kind and description owned, held, contracted for and hereafter to be acquired by the sellers in that section known and designated as R. P. Haldeman Subdivision, Jim Wells County, Texas, exclusive of surface rights. * * *
FIFTH: The purchaser will pay to the sellers the sum of *210 Twenty Nine Thousand Dollars ($29,000.00) in the following manner: Seven Thousand Dollars ($7,000.00) in the form of royalty acreage in the Haldeman Subdivision in Sections 30, 26, 11 and 8. This acreage will be figured at the base price of Three Hundred Fifty Dollars ($350.00) per acre; Twenty Two Thousand Dollars ($22,000.00) at the time of and upon the release and license of the use of said funds by the Modern Investment Company, Inc. of Panama, and the purchaser represents that application therefor will be filed forthwith. * * * The agreement of sale dated July 21, 1941, described petitioner and his wife as the "sellers" and Palmaro, syndicate manager of the 5th syndicate, as the "purchaser" and among other things provided as follows: FIRST: The sellers will sell, transfer, assign, and convey to the purchaser, and the purchaser will purchase an undivided interest equal to three per centum (3%) of all leases, royalties, distillate rights, mineral rights, and rights of whatsoever kind and description owned, held, contracted for and hereafter to be acquired by the sellers in that section known and designated as R. P. Haldeman Subdivision. Jim Wells County, Texas, exclusive of surface *211 rights. * * *
FIFTH: The purchaser will pay to the seller the sum of Fourteen thousand five hundred dollars ($14,500.00) in the following manner: Not more than a maximum amount of thirteen thousand three hundred dollars ($13,300.00) in the form of royalty acreage in the Haldeman Subdivision in Sections: 30, 26, 11 and 8. This acreage will be figured at the base price of Three Hundred fifty dollars ($350.00) per acre; And not less than One thousand two hundred dollars ($1,200.00) in cash. The cost of the above mentioned undivided interests sold by petitioner and his wife to the 4th and 5th syndicates was the amount of $5,953.69. *
Issue (15). On or about April 5, 1940, petitioner purchased as his own separate property certain oil leases in Louisiana from Fred W. Dumraese for $5,142.80. In January 1941, a dry hole was drilled within 1,320 feet of this property and in March 1941, another dry hole was drilled within 2,640 feet of petitioner's property. Petitioner's leases were between the two dry holes. Petitioner's leases provided for a delay rental which became due in 1941. After the second dry hole was *212 drilled petitioner decided that his leases were worthless and abandoned them by failing to pay the delay rental. The lessors did not ask petitioner to give a release as the whole tract was condemned in 1942 when a third dry hole was drilled. The Dumraese leases became worthless in 1941 and were abandoned by petitioner in that year. Petitioner sustained a deductible loss in 1941 of $5,142.80. Issue (16). On April 25, 1941, petitioner and his wife sold 5/295 shares of syndicate units to Malvina Du Fresne for the sum of $400. These units cost petitioner and his wife $500. They sustained a loss of $100 on the sale. On December 13, 1941, petitioner and his wife transferred 5/295 shares of syndicate units to John T. Pratt, Jr. as a bonus in connection with a sale of undivided royalty interests (5.714 royalty acres) to Pratt for a consideration of $2,000. This $2,000 is a part of the $5,150 mentioned under Issues (2) to (6), supra, as the total consideration for sales during the period July 1 to December 31, 1941. These units had a cost basis to petitioner and his wife of $500. On December 21, 1941, petitioner and his wife transferred 2.5/295 shares of syndicate units to Robert Winthrop *213 as a bonus in connection with a sale of undivided royalty interests (6.428 royalty acres) to Winthrop for a consideration of $2,250. This $2,250 is a part of the $5,150 mentioned under Issues (2) to (6), supra, as the total consideration for sales during the period July 1 to December 31, 1941. These units had a cost basis to petitioner and his wife of $250. Issue (18). The return for 1940 was not filed until September 13, 1941, although March 15, 1941, was the due date for filing. Petitioner was in Louisiana in March of 1941 and did not have his records with him. He asked his attorney in Chicago to secure an extension of time but the record does not show whether the attorney made such a request. In any event no extension was granted. Petitioner did not file any affidavit with the collector stating why he was filing a belated return. Petitioner has failed to prove that the delay in filing the 1940 return was due to reasonable cause and not due to willful neglect. Additional General Findings. Petitioner's net income for 1940 was $10,947.81, computed as follows: Community Income and Deductions: Sales of royalty acres
$38,663.89
Less: Cost
5,144.20
Gross profit on these sales
$33,519.69
Sales to 3rd syndicate
14,000.00
Less: Cost of royalty interests
$1,099.57
Cost of leases
1,974.59
3,074.16
Gross profit on these sales
10,925.84
Total gross profit
44,445.53
Deduct: Expenses
9,154.91
Commissions
11,175.00
Delay rentals
420.00
Reasonable compensation to son
1,800.00
22,549.91
Net community income
21,895.62
One-half taxable to petitioner
$10,947.81
*214 Petitioner's net income for 1941 was $11,422.17 computed as follows: Community Income and Deductions: Sales of royalty acres
$21,300.00
Less: Cost
2,850.08
Gross profit on these sales
$18,449.92
Sales of royalty acres
5,150.00
Less: Cost of royalty interests
$1,426.90
Cost of syndicate units transferred as
bonuses
750.00
2,176.90
Gross profit on these sales
2,973.10
Sales to 4th and 5th syndicates
Cash received
23,200.00
Fair market value of property received
20,300.00
Total
$43,500.00
Less: Cost
5,953.69
Gross profit on these sales
37,546.31
Total gross profit
58,969.33
Deduct: Expenses
$ 9,915.64
Commissions
8,925.00
Expenses, commissions & fees
4,500.00
Loss on sale of syndicate units
100.00
Loss on abandonment of two leases
598.75
Reasonable compensation to son
1,800.00
$25,839.39
Net community income
33,129.94
One-half taxable to petitioner
16,564.97
Separate Deduction: Loss on abandonment of Louisiana oil leases
5,142.80
Petitioner's net income
$11,422.17
Opinion BLACK, Judge: We will consider in their regular order the issues remaining for our disposition. Issue (2). Petitioner contends that he is not taxable on income from sales of the separate property of his wife but is taxable only on one-half of the income from sales *215 of community property held by petitioner and his wife. The fact that petitioner and his wife were domiciled in the State of Illinois, a non-community property state, does not bar this contention as this contention relates only to dealings in real property in Texas, which is a community property state. See Hammonds v. Commissioner, 106 Fed. (2d) 420. The respondent in answering paragraph 5 (a) of the second amended petition has "denied that the income tax returns filed by petitioner for the years 1940 and 1941 were other than joint returns of petitioner and his wife." The respondent, therefore, contends that the returns filed were joint returns; that having filed joint returns petitioner cannot now change and file separate returns; and that having filed joint returns, the tax, as provided by section 51 (b) [1] of the Internal Revenue Code "shall be computed on the aggregate income and the liability with respect to the tax shall be joint and several." If the respondent's contentions were correct, it would be unnecessary to segregate the income and deductions here in question into separate and community income and deductions as petitioner has requested in his request for findings of fact. *216 Petitioner takes the position that there is no issue in the case regarding the type of returns filed for the several reasons that the respondent sent the deficiency notice to him alone instead of making it a "single joint notice" under Section 272(a)(1), [2] *217 I.R.C.; that the respondent in the notice sent to petitioner reduced the personal exemption claimed to that of a single person; that by doing these things it must necessarily be held that the respondent had determined that the returns filed were the separate returns of petitioner; and that if the respondent wishes to reverse his position he must affirmatively do so by amended answer and assume the burden of proof. We agree with petitioner that there is no assignment of error in the petition alleging that the returns filed by him for the taxable years 1940 and 1941 were other than his separate returns. The respondent has in effect determined the deficiencies herein on the basis of separate returns. Section 25 (b)(1) of the Internal Revenue Code, as amended by Sections 6(a) and 9 of the Revenue Act of 1940 provides that for the year 1940 there shall be allowed as a credit against net income the following: (1) Personal exemption. - In the case of a single person or a married person not living with husband or wife, a personal exemption of $800; or in the case of the head *218 of a family or a married person living with husband or wife, a personal exemption of $2,000. A husband and wife living together shall receive but one personal exemption. The amount of such personal exemption shall be $2,000. If such husband and wife make separate returns, the personal exemption may be taken by either or divided between them. The same section of the Code as further amended by sections 111 (a) and 118 of the Revenue Act of 1941 allowed as a credit against net income for the year 1941 a personal exemption of $750 for a single person or a married person not living with husband or wife and $1,500 for a husband and wife living together. Although petitioner claimed a personal exemption of $2,000 on his 1940 return and a personal exemption of $1,500 on his 1941 return, the respondent in his determination of the deficiencies reduced these amounts to $800 and $750, respectively. Thus it would seem that the respondent has in effect determined that the returns filed by petitioner were his own separate returns and not joint returns of himself and his wife. Otherwise he would have had no ground for reducing the exemptions as he did. Furthermore, if the respondent had determined *219 that the returns filed by petitioner were joint returns he should have mailed a "single joint notice" of deficiency under section 272 (a) (1) of the Code instead of the single notice to petitioner alone. The returns were in the name of William Francis Horsting. Underneath his name on the face of the return is printed this instruction "(Use given names of both husband and wife, if this is a joint return.)" Printed below the blank for signatures were the instructions that "If this is a joint return (not made by agent), it must be signed by both husband and wife." Petitioner alone signed both returns. He included therein as his income what he regarded as all the income which had been derived from his wife's separate property and from the community property owned by him and his wife, based upon the erroneous advice he had received from his own attorney (a Mr. Patton) and two employees of the collector's office to the effect that the community property laws of Texas did not apply to residents of Illinois in situations like those of petitioner and his wife. Cf. Hammonds v. Commissioner, supra.
The respondent does not now question petitioner's right to apply the community property laws *220 of Texas to the income and deductions here in question if the returns filed by him were his separate returns. He merely contends that the returns filed were joint and that, therefore, the community property question is immaterial. In our opinion the respondent is not in a position to make such a contention. In his determination of the deficiencies he made no determination that the returns filed were the joint returns of husband and wife and he raised no such issue by any affirmative allegations in his answer. We hold that no issue has been properly raised by the pleadings as to whether the returns filed were joint returns. The respondent did not properly raise such an issue in his above-mentioned answer to paragraph 5 (a) of the second amended petition wherein the respondent "denied that the income tax returns filed by petitioner for the years 1940 and 1941 were other than joint returns of petitioner and his wife." There was no such allegation to deny. Petitioner alleged in paragraph 5(a) only the following: (a) Petitioner keeps his books and files his income tax returns on the cash receipts and disbursements basis and by calendar years. Throughout 1940 and 1941 he was a married man *221 living with his wife and furnishing the chief support of his son, Robert, who was born February 7, 1923. In computing petitioner's taxable income for 1940 and 1941 respondent has allowed petitioner only the personal exemption of a single person and no credit for a dependent. If the respondent desired to contend that the returns filed by petitioner were in fact joint returns he should have affirmatively so alleged and assumed the burden of proof of such an allegation. Having failed to do so, we hold that the returns filed by petitioner for the taxable years 1940 and 1941 were none other than his separate returns. Even if we are in error in holding that under the pleadings no issue of joint returns is raised and that it should be assumed that respondent in answering 5(a) of the second amended petition by saying: "It is denied that the income tax returns filed by petitioner for the years 1940 and 1941 were other than joint returns of petitioner and his wife" raised the issue of joint returns, our holding is the same. We hold that under the facts which have been proved the returns were the separate returns of petitioner. Regulations 103, Sec. 19.51-1 applicable to the taxable years which *222 we have before us reads: A joint return of a husband and wife (if not made by an agent other than husband or wife. see section 19.51-2) shall be signed by both spouses, except that one spouse may sign the return as the agent for the other, if the return is accompanied by a power of attorney on Form 936, authorizing such action. * * * Mertens Law of Federal Income Taxation, Vol. 8, Sec. 47.07, says of the above-quoted regulations: The requirement that both spouses sign a joint return has done much to clear up the difficulties which formerly incumbered the filing of a joint return. Thus whether a joint return was filed, even though indicated to be such, was frequently adjudged a matter of intent. A return which reported all gross income produced by and accruing to both husband and wife might be a joint return even though it had been signed merely by the husband. As we have already pointed out, the returns here in question both for 1940 and 1941 were signed by petitioner alone. They included only income which petitioner believed to be his own, he having been advised by his counsel and representatives of the Bureau of Internal Revenue that income from the sale of property in Texas could *223 not be returned on a community property basis by a husband and wife living in the State of Illinois. Under these facts and others in the record, if it be assumed that the issue has been properly raised, we hold the return was a separate return and not a joint return. See William W. Kellett, 5 T.C. 608. If, therefore, petitioner has included therein any income which under the community property laws of Texas belonged to his wife, we hold that he is entitled to have such income excluded from his taxable income provided he has sustained his burden of proof of such an allegation. We will now consider the remaining issues in the light of these holdings. Issue (3). Section 117 (a) (1) of the Internal Revenue Code provides in part that: * * * The term "capital assets" means property held by the taxpayer (whether or not connected with his trade or business), but does not include * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business * * * Petitioner contends that the oil properties held by himself and his wife were held primarily as an investment and not primarily for sale to customers in the ordinary course of business. The respondent *224 contends otherwise. We agree with the respondent. Petitioner argues first that he and his wife were not in the "business" of dealing in oil properties. We think this is contrary to the evidence. On his 1940 return he stated that his principal occupation or profession was "Dealer - oil leases" and on cross examination he stated that he was in the same kind of business in 1941 as he was in 1940. During these years he traveled extensively in connection with the transactions resulting in the many purchases and sales set out in our findings. Petitioner and his wife had no income during these years other than that derived from the sales made. In Flint v. Stone Tracy Co., 220 U.S. 107, the Supreme Court in considering whether certain corporations there involved were engaged in business, said: * * * "Business" is a very comprehensive term and embraces everything about which a person can be employed. * * * "That which occupies the time, attention, and labor of men for the purpose of a livelihood or profit." 1 Bouvier's Law Dict. p. 273. Applying this definition to the evidentiary facts appearing in the record and considering the frequency, regularity and continuity of the many transactions *225 here involved we think it is clear that petitioner and his wife, represented by petitioner as her duly authorized agent, were, during the taxable years, engaged in the business of buying oil properties and selling undivided interests therein and we have so found as an ultimate fact. We have also found as an ultimate fact that the oil properties in question were held primarily for sale to customers in the ordinary course of business rather than primarily as an investment. In this connection the evidentiary facts here are very similar to those involved in Greene v. Commissioner, 141 Fed. (2d) 645. In that case petitioners, were husband and wife residing in Texas. The parties there agreed that petitioners there were in the business of buying and selling oil properties. The years there involved were 1938 and 1939. The taxpayers there had gradually built up their community holdings until they had approximately 100 separate oil leases or interests at the time of the hearing before the Tax Court. In 1938 they sold 18 mineral leases and interests, and in 1939 they sold 19 similar properties. We held as an ultimate fact that the properties were held primarily for sale to customers in the ordinary *226 course of business and were affirmed by the Fifth Circuit. In the instant case petitioner made 34 sales in 1940 and 15 sales in 1941. We think our ultimate finding here must be the same as it was in the Greene case. We, therefore, decide the issue against petitioner. There were no sales of "capital assets" and the gains derived herein cannot be taxed as long-term capital gain. Issues (4), (5) and (6). These issues involve mainly pure questions of fact which have been stipulated. The stipulated facts are set forth in our findings. Petitioner, however, has requested us to make certain findings in addition to the stipulated facts. Relating to the year 1940, petitioner has requested us to find that of the total sales made in that year for an aggregate gross sales price of $38,663.89 "$14,390.70 (37.22 percent) were sales of the separate property of petitioner's wife and the balance of $24,273.19 represented sales of their community property." The manner in which the percentage of 37.22 is arrived at is set out in our findings. As to the $14,000 received in 1940 from the sales in 1939 to the 3rd syndicate, petitioner has requested us to find that $3,132.50 [3] represented a sale of the *227 separate property of petitioner's wife, and the balance of $10,867.50 represented a sale of royalty acres and oil leases held by them as community property. As to the expenses of $9,154.91 and commissions of $11,175, petitioner has requested us to allocate 33.27 percent [4] *228 as deductions from separate income and the balance as deductions from community income. Relating to the year 1941, petitioner has requested us to find that of the gross sales price of $26,450 ($21,300 plus $5,150) "$9,844.69 (37.22 percent) were sales of the separate property of petitioner's wife and the balance of $16,605.31 represented sales of their community property." As to the expenses of $9,915.64 and commissions of $8,925, petitioner has requested us to find that "the amount of $3,735.72 (19.828%) [5] is attributable to the sales of the separate property of petitioner's wife, and the balance of $15,104.92 is attributable to the sales of the community property of petitioner and his wife." As authority for these additional requested findings petitioner says in his brief that "This Court has recently recognized the fact that the separate property of the wife may be traced by 'proportions.' See W. D. Johnson, 1 T.C. 1041, 1053." We fail to see wherein the Johnson case is of any help to petitioner here. In that case we recognized the principle which was stated by *229 the court in Hammonds v. Commissioner, supra, that "Separate property remains separate through all its mutations and changes so long as it can be clearly and indisputably traced and identified." But we also stated that "Under Texas law when separate and community funds are so commingled that they can not be traced, the whole fund is held to be community property." In the instant proceeding we think petitioner has failed to clearly and indisputably trace and identify any of the proceeds received in 1940 and 1941 as representing proceeds from the sale of his wife's separate property. We hold that the allocation method suggested by petitioner and explained in the preceding paragraphs cannot take the place of proof. The burden was on petitioner to show what part, if any, of the total sales in 1940 and 1941 were sales of the separate property of petitioner's wife. We hold that petitioner has failed to meet this burden and under the Texas law, as above stated, the entire proceeds are held to be community property. Taylor v. Suloch Oil Co. (Tex. Civ. App.), 141 S.W. (2d) 657; Ervin v. Ervin (Tex. Civ. App.), 128 S.W. 1139. We also hold that all of the above-mentioned expenses and commissions *230 attributable to these sales should, in view of the previous holding, be allowed as community deductions. Issue (8). The error here assigned is that "for 1940 and 1941 respondent has erroneously failed to allow petitioner reductions of not less than $420.00 and $2,646.00, respectively, for delay rentals paid by him in those years." The parties stipulated that "During 1940 petitioner and his wife paid delay rentals * * * of $420.00." There was no stipulation as to 1941 and petitioner has failed to prove that any amount of delay rentals was paid in 1941. It follows that petitioner and his wife are only entitled to the deduction of $420 for the year 1940 as a community deduction. Issue (9). Briefly petitioner and his wife in 1939 sold approximately a one-fourth undivided interest in their then oil holdings to three syndicates and agreed that the syndicates would immediately become vested with ownership of the same proportion of any undivided interest in the Haldeman Subdivision which petitioner and his wife might thereafter acquire. Petitioner and his wife were not obligated to acquire any such additional interests. They did, however, acquire additional undivided interests in both 1940 *231 and 1941. The cost of these undivided interests in 1940 and 1941 which thus belonged to the said syndicates under the 1939 agreements are set forth in our findings. Petitioner contends that good tax accounting requires that these amounts be allowed as deductions in 1940 and 1941, respectively, as either expenses, losses or costs. The respondent contends that they should be capitalized and considered as a part of the total cost of the remaining approximately three-fourths of additional undivided interests which petitioner and his wife acquired in 1940 and 1941. The parties have agreed that the items here involved should either be capitalized or deducted as expenses, losses or costs. Petitioner and his wife resold in 1940 and 1941 some of these interests which they purchased in those years and the parties have also agreed upon the basis of the property sold in case we decide this issue for petitioner and also upon the basis of the property sold in case we decide this issue for the respondent. Petitioner cites in support of his contention Associated Patentees Inc., 4 T.C. 979; Scherman v. Helvering, 74 Fed. (2d) 742; H. M. Howard, 22 B.T.A. 375; Helvering v. Hampton, 79 Fed. (2d) 358; *232 North American Oil Consolidated v. Burnet, 286 U.S. 417; Reis v. Commissioner, 142 Fed. (2d) 900; Detroit Edison Co. v. Commissioner, 319 U.S. 98; and Charles Burke, 5 T.C. 1167. The respondent cites in support of his contention Kentucky Land, Gas & Oil Co., 2 B.T.A. 838, and R. S. Goforth, 32 B.T.A. 1206. We do not think any of these cases are directly in point. It may be that the Detroit Edison Co. case touches upon the principle here involved but in a way favoring the respondent rather than petitioner. In that case the taxpayer sold electric energy. It received many applications for service which in its opinion would require an investment in extension of its facilities greater than prospective revenues therefrom would warrant. It went ahead and made the investments but was reimbursed in part by its customers. It was not required to include the reimbursements in its income. It contended nevertheless that it was entitled to deduct depreciation on the total cost of the investments. The Government contended that the taxpayer's cost basis should be adjusted downward to the extent of the reimbursements. The Supreme Court decided in favor of the Government and in the course of *233 its opinion it said: But we think the statutory provision that the "basis of property shall be the cost of such property" § 113(a) normally means, and that in this case the Commissioner was justified in applying it to mean, cost to the taxpayer. A property may have a cost history quite different from its cost to the taxpayer. It may have been purchased for less or more than original cost, or built by contract which called for payments on which the builder profited greatly or suffered heavy loss. But generally and in this case the Commissioner was in no error in ruling that the taxpayer's outlay is the measure of his recoupment through depreciation accruals. In the instant case we think the basis of the remaining approximately three-fourths of the additional undivided interests which petitioner and his wife acquired in 1940 and 1941 should include the cost of the approximately one-fourth which immediately belonged to the syndicates under the 1939 contracts. We think that good tax accounting requires that this be done. This is but another way of saying that the amounts here in question should be capitalized as the respondent contends. Petitioner and his wife were not, under the 1939 *234 contracts, obligated to buy any additional interests. But if they did purchase additional interests they were obligated to turn approximately one-fourth of the purchases over to the syndicates. Petitioner and his wife must, therefore, have valued their particular benefits to the full extent of the price paid for the undivided interests, otherwise they would not have purchased them. The cost, therefore, of the undivided interest which is not allocable to the interests sold during the years 1940 and 1941, remain, we think, as an unrecovered cost for future sales. We hold that the said amounts of $5,300 and $5,180.48 are not allowable as deductions from gross income in the taxable years 1940 and 1941, respectively. Issue (10). Petitioner contends that for the years 1940 and 1941 he is entitled to deduct under section 23 (a) (2), I.R.C., that portion of the amounts of $6,430 and $3,984.39, respectively, which is allocable to his one-half of the community income of himself and his wife. We think since we have held under Issue (3) that petitioner and his wife were engaged in business the applicable section of the Code is section 23 (a) (1) rather than 23 (a) (2), the material portion of *235 which is in the margin. [6]
The respondent in his brief says "Any compensation paid to petitioner's son for sales in 1940 must have been included in $11,175.00 or the son rendered no services in sales during 1940." The evidence shows that not any of the $6,430 paid to the son in 1940 was included in the amount of $11,175 paid to salesmen for commissions, and that the son spent his entire time in 1940 in buying leases and his entire time in 1941 in selling undivided interests. Considering all of the evidence we are of the opinion and have found as an ultimate fact that petitioner and his wife are entitled to a deduction of $1,800 for each year as representing a reasonable allowance for compensation for personal services actually rendered by their son during the taxable years in question. Since *236 petitioner has failed to prove what part, if any, of the total receipts of petitioner and his wife were from the sales of the separate property of petitioner's wife, the deduction of $1,800 each year will be allowed as a community deduction. Issue (11). Petitioner has requested no findings of fact as to this issue. Item (12). In his brief the respondent says "If the Court holds that the petitioner and his wife were in the business of dealing in oil properties this question will, accordingly, be determined under Rule 50." In view of our holding under Issue (3), the present issue will be determined under Rule 50. Issue (13). Section 23 (k), I.R.C., as amended, provides that in computing net income there shall be allowed as deductions: "Debts which become worthless within the taxable year * * *." The respondent contends that petitioner has not proved that the debt became worthless in the taxable year 1940 or had any value at the beginning of the taxable year. We agree with this contention. Although petitioner did not think the borrower would be able to repay the loan he did think the collateral had value and petitioner was very eager to own the collateral. This collateral (the lease), *237 however, was lost through a tax and adverse possession suit shortly after the loan was made. We think the debt became worthless when the lease was lost and since petitioner has failed to prove when the loan was made and when the lease was lost, it follows that he has failed to prove in what year the debt became worthless. We hold, therefore, that petitioner has failed to prove that the debt became worthless "within the taxable year" 1940, and that he is not entitled to any deduction in 1940 as a result of this loan. Issue (14). Petitioner contends that the sale by him and his wife in 1941 of approximately a 10 percent undivided interest in their Texas community property holdings to the 4th and 5th syndicates for $23,200 in cash and the return to them of 58 royalty acres was a tax-free exchange, except for the cash received, under section 112, I.R.C., the material provisions of which are in the margin. [7] *238 Under Issue (3) we held that petitioner and his wife were holding there Texas properties "primarily for sale" to customers in the ordinary course of their trade or business. That fact takes the transactions here in question out of the exceptions mentioned in subsections (b) (1) and (c) (1) of section 112. *239 Since no exceptions to the general rule stated in section 112 (a) are applicable, it follows that the entire amount of the gain shall be recognized. We hold, therefore, that the community gain realized on these two sales is $33,046.31 (cash $23,200 plus fair market value of 58 royalty acres $20,300, minus cost of sales $5,953.69, and minus traveling expenses, commissions and attorney fees of $4,500). *
Issue (15). Section 23 (e) of the Internal Revenue Code provides in part that in computing net income there shall be allowed as deductions: (e) Losses by Individuals. - In the case of an individual, losses sustained during the taxable year and not compensated for by insurance or otherwise - (1) if incurred in trade or business; or (2) if incurred in any transaction entered into for profit, though not connected with the trade or business * * *. Petitioner contends that under this statute he is entitled to deduct as a separate loss as distinguished from a community loss the cost of the leases which he claims to have abandoned in 1941 by failing to pay the delay rental which became due in that year. The failure *240 to pay the delay rental was due to the drilling of two dry holes near this property in January and March of 1941. The respondent contends that petitioner's leases did not become worthless until 1942, when a third dry well was drilled near the property after which the whole tract was condemned. Our findings under Issue (15) show this lease was purchased by petitioner as his own separate property. We think petitioner sustained a separate loss, represented by the cost of the Dumraese leases, when he failed to pay the delay rental which became due in 1941. After the second dry well was drilled petitioner was satisfied that the leases were not worth renewing. In S. W. Forrester, 23 B.T.A. 942 [Dec. 7070], the petitioner there failed to pay the rent on the Good lease when it became due in 1920 after a dry hole was drilled in the summer of that year. In our opinion in that case we said: * * * The Good lease was entered into on September 5, 1919, and the well came in dry in the summer of 1920. The petitioner did not pay the rent required to continue the lease. The petitioner is entitled to deduct the cost of this lease from his gross income for 1920. * * * Likewise, in the instant case, petitioner *241 here is entitled to deduct the cost of the Dumraese leases ($5,142.80) from his gross income for 1941. Issue (16). In his brief the respondent concedes that petitioner and his wife are entitled to a loss deduction of $100 on the sale of syndicate units to Du Fresne. Petitioner, however, also contends that he and his wife are entitled to a loss deduction of $750 on the two transfers of syndicate units to Pratt and Winthrop. This represents the cost of those units to petitioner and his wife. The respondent contends that these transfers were gifts to Pratt and Winthrop and that, therefore, petitioner and his wife are not entitled to the loss claimed. The evidence shows that these transfers to Pratt and Winthrop were bonuses in connection with sales of undivided royalty interests to these individuals. The transfers were not gifts as contended by the respondent. Since petitioner is to be taxed on the profit from the sales to Pratt and Winthrop, we think that in computing the profit, petitioner should be allowed as a part of the cost of the property sold the cost of these syndicate units transferred as a bonus. In our findings under Issues (2) to (6), inclusive, we found that the cost to *242 petitioner and his wife of the royalty interests sold during the period July 1 to December 31, 1941, was $1,426.90. We hold that the taxable profit on the three sales made during that period should be computed as follows: Gross selling price
$5,150.00
Less cost of property sold: Undivided royalty interests
sold
$1,426.90
Syndicate units transferred
as bonuses
750.00
2,176.90
Taxable profit
$2,973.10
Since we have held that the cost of the syndicate units transferred to Pratt and Winthrop should be allowed as a part of the cost basis in determining the profit on the sales of undivided royalty interests to Pratt and Winthrop, it follows that petitioner and his wife are not also entitled to a loss of $750 or any other amount on the transfer of these units. Issue (18). The respondent contends that under Code section 291[8] petitioner is liable to a penalty of 25 percent of the tax for failure to file the 1940 return within the time prescribed by law. As found in our findings petitioner has not shown that the failure to file the return on time was due to reasonable cause and not to willful neglect. We hold that the penalty should be added. See Nathan Blum, 5 T.C. 702; Berlin v. Commissioner, 59 Fed. (2d) 996, *243 certiorari denied 287 U.S. 642. The deficiencies for 1940 and 1941 and the penalty for 1940 should be redetermined in accordance with this report. Decision will be entered under Rule 50. Memorandum and Order (July 18, 1946) BLACK, Judge: On June *244 21, 1946 petitioner filed a motion to reconsider the Memorandum Findings of Fact and Opinion entered May 27, 1946 with respect to the single question of the cost basis of property sold to the 4th and 5th syndicates. This matter is treated in our report as Issue (14). Pursuant to our order dated June 24, 1946 a hearing was held on July 17, 1946 upon the said motion filed by petitioner at which hearing the respondent filed a memorandum brief in opposition to petitioner's motion for reconsideration. We have again considered the record relating to Issue (14) together with the petitioner's motion for reconsideration, the respondent's brief in opposition and the arguments of counsel made at the above mentioned hearing. Petitioner's assignment of error (o) in the second amended petition is as follows: (o) If it should be held that the property interest exchanged by petitioner in 1941 in the information of the First and Second Southwest Oil Syndicates was not a tax-free exchange, then respondent has erroneously failed to allow petitioner to deduct not less than $4,317.29 representing the cost of the property transferred to these syndicates. In our findings (p. 11) we found the following: From *245 1939 through 1941 petitioner and his wife made various sales to certain syndicates described as Haldeman Subdivision Oil Syndicate, Jim Wells County Oil Syndicate, Jim Wells-Horsting Oil Syndicate, First Southwest Texas Oil Syndicate, and Second Southwest Texas Oil Syndicate, and hereinafter sometimes referred to as the 1st, 2nd, 3rd, 4th and 5th syndicates, respectively. * * * It is, therefore, apparent that the 4th and 5th syndicates were the First Southwest Texas Oil Syndicate and the Second Southwest Texas Oil Syndicate, respectively, referred to in assignment of error (o). We also found in our report entered May 27, 1946 that petitioner and his wife acquired the following properties at the following costs: Royalty acres
$22,210.71
Pre-1940 leases
7,983.37
1940 leases
9,042.86
58 additional royalty acres
20,300.00
Total cost
$59,536.94
Under Issue (14) we also found that petitioner and his wife sold to the 4th and 5th syndicates an undivided interest equal to 10 percent of all their "leases, royalties, distillate rights, mineral rights, and rights of whatsoever kind and description owned, held, contracted for and hereafter to be acquired by the sellers * * *." It is now our opinion that *246 we erred in not allowing petitioner and his wife to deduct at least 10 percent of their total cost of $59,536.94 in arriving at the community gain from the sale of a 10 percent interest to the 4th and 5th syndicates. The premises considered, it is ORDERED: (1) That under Issue (14) of our findings of fact, a new paragraph be added reading as follows: The cost of the above mentioned undivided interests sold by petitioner and his wife to the 4th and 5th syndicates was the amount of $5,953.69. (2) That the computation on page 21 of our report beginning with Petitioner's net income for 1941 was $14,399.02" be deleted from the report, and a new paragraph be added reading as follows: Petitioner's net income for 1941 was $11,422.17 computed as follows: Community Income and Deductions: Sales of royalty acres
$21,300.00
Less: Cost
2,850.08
Gross profit on these sales
$18,449.92
Sales of royalty acres
5,150.00
Less: Cost of royalty
interests
$1,426.90
Cost of syn-
dicate units
transferred
as bonuses
750.00
2,176.90
Gross profit on these sales
2,973.10
Sales to 4th and 5th syn-
dicates
Cash received
23,200.00
Fair market value of
property received
20,300.00
Total
43,500.00
Less: Cost
5,953.69
Gross profit on these sales
37,546.31
Total gross profit
$58,969.33
Deduct: Expenses
9,915.64
Commissions
8,925.00
Expenses, commissions
and fees
4,500.00
Loss on sale of syndi-
cate units
100.00
Loss on abandonment of
two leases
598.75
Reasonable compensa-
tion to son
1,800.00
25,839.39
Net community income
33,129.94
One-half taxable to petitioner
16,564.97
Separate Deduction: Loss on abandonment of Louisiana
Oil leases
5,142.80
Petitioner's net income
$11,422.17
(3) *247 That the last two sentences in our opinion under Issue (14) (page 36 [CCH page 436 herein] of our report) be deleted from the report, and a new paragraph be added reading as follows: We hold, therefore, that the community gain realized on these two sales is $33,046.31 (cash $23,200 plus fair market value of 58 royalty acres $20,300, minus cost of sales $5,953.69, and minus. traveling expenses, commissions and attorney fees of $4,500). Footnotes
1. Note: The official Tax Court headnote, reproduced here, does not cover all issues. - CCH.↩
*. This paragraph was added pursuant to Tax Court order dated July 18, 1946. - CCH.↩
1. SEC. 51. INDIVIDUAL RETURNS. * * * * *
(b) Husband and Wife. - A husband and wife may make a single return jointly. Such a return may be made even though one of the spouses has neither gross income nor deductions. If a joint return is made the tax shall be computed on the aggregate income and the liability with respect to the tax shall be joint and several. * * *↩
2. SEC. 272. PROCEDURE IN GENERAL. (a)(1) Petition to Board of Tax Appeals. - If in the case of any taxpayer, the Commissioner determines that there is a deficiency in respect to the tax imposed by this chapter, the Commissioner is authorized to send notice of such deficiency to the taxpayer by registered mail. * * * In the case of a joint return filed by husband and wife such notice of deficiency may be a single joint notice, except that if the Commissioner has been notified by either spouse that separate residences have been established, then, in lieu of the single joint notice, duplicate originals of the joint notice must be sent by registered mail to each spouse at his last known address.
3. The manner in which petitioner arrived at the amount of $3,132.50 was set out in a footnote to his request for findings as follows: The 3rd Syndicate received a 3/64ths interest in royalty acres (Ex. 6), or 26.62 royalty acres (3/64 X 567.88). These were selling at $350.00 ($38,663.89./. 112.4152) so that the 3rd Syndicate received royalty acres worth $9,317.00 of which 37.22 per cent was the separate property of petitioner's wife. The value of this separate property was $3,467.79 ($9,317.00 X 37.22%) and 140/155 of it, or $3,132.50, represented the portion of the separate property of petitioner's wife attributable to the amounts received in 1940. ↩
4. This percentage is arrived at as follows: $14,390.70 plus $3,132.50 equals $17,523.20. $24,273.19 plus $10,867.50 equals $35,140.69. $17,523.20 plus $35,140.69 equals $52,663.89. $17,523.20 divided by $52,663.89 equals 33.27 percent.
5. This percentage is arrived at as follows: $9,844.69 plus $16,605.31 plus $23,200(see Issue 14) equals $49,650. $9,844.69 divided by $49,650 equals 19.828 percent.↩
6. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: (a) Expenses. - (1) Trade or business expenses. - (A) In General. - All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *↩
7. SEC. 112. RECOGNITION OF GAIN OR LOSS. (a) General Rule. - Upon the sale or exchange of property the entire amount of the gain or loss, determined under section 111, shall be recognized, except as hereinafter provided in this section. (b) Exchanges Solely in Kind. - (1) Property held for productive use or investment. - No gain or loss shall be recognized if property held for such productive use in trade or business or for investment (not including stock in trade or other property held primarily for sale * * *) is exchanged solely for property of like kind to be held either for productive use in trade or business or for investment. * * * * *
(c) Gain from Exchanges Not Solely in Kind. - (1) If an exchange would be within the provisions of subsection(b) (1) * * * of this section if it were not for the fact that the property received in exchange consists not only of property permitted by such paragraph * * * to be received without the recognition of gain, but also of other property or money, then the gain, if any, to the recipient shall be recognized, but only in an amount not in excess of the sum of such money and the fair market value of such other property.↩
*. This paragraph was added pursuant to Tax Court order dated July 18, 1946. - CCH.↩
8. SEC. 291. FAILURE TO FILE RETURN. In case of any failure to make and file return required by this chapter, within the time prescribed by law or prescribed by the Commissioner in pursuance of law, unless it is shown that such failure is due to reasonable cause and not due to willful neglect, there shall be added to the tax: 5 per centum if the failure is for not more than thirty days with an additional 5 per centum for each additional thirty days or fraction thereof during which such failure continues, not exceeding 25 per centum in the aggregate. The amount so added to any tax shall be collected at the same time and in the same manner and as a part of the tax unless the tax has been paid before the discovery of the neglect, in which case the amount so added shall be collected in the same manner as the tax. The amount added to the tax under this section shall be in lieu of the 25 per centum addition to the tax provided in section 3612(d)(1)↩.